UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

CIVIL CASE 7:15-46-ART-HAI

CHERYL MARTIN, *Individually, and on behalf of*            PLAINTIFFS
*all others similarly situated*

&

ROBERT MARTIN, *Individually, and on behalf of*
*all others similarly situated*

VS.          **MEMORANDUM IN SUPPORT OF**
               **PLAINTIFFS' SECOND MOTION**
               **FOR PRELIMINARY INJUNCTION**

CAROLYN W. COLVIN, *in her official capacity as*         DEFENDANT
*Acting Commissioner of the Social Security Administration*

COME THE PLAINTIFFS, Cheryl Martin and Robert Martin, as individuals and on behalf of all other persons similarly situated, by and through counsel, and in support of Plaintiff's Second Motion for Preliminary Injunction, offer the following for consideration of the Court.

**I.**        **BACKGROUND AND INTRODUCTION**

Plaintiffs filed their Complaint against Defendant, after Defendant served notices, all dated in May, 2015, on a group of 1500 disability benefit recipients, all but a few of whom were located within a limited geographical region of eastern Kentucky. Of these 1500, 600 were Supplemental Security Income (SSI) recipients, who were notified that they would face new,

1

"initial" disability hearings, but that their benefits would continue until a decision was made following such hearings. The other 900 were Social Security Disability (SSD) recipients, who were notified that their benefits would terminate immediately, and that they would also face new, "initial" disability hearings.[1]

In both cases, Defendant's notification letters based this abrupt action on the stated grounds that each of these 1500 disabled people had been initially represented by disability attorney, Eric C. Conn; that their initial disability determinations had included medical records submitted by one of several named doctors who routinely worked with Conn; and that the SSA was compelled to review each case, when there was reason to believe that fraud had affected "certain cases" that included evidence from those doctors.  The notifications contained no stated

---

[1] A typical notice read as follows:

> **IMPORTANT INFORMATION**
>
> We are writing to let you know that we are suspending your disability benefits and the benefits of anyone entitled under your Social Security record.  We are suspending these benefits while we redetermine whether you were entitled to benefits based on the August 2, 2010 decision of the Administrative Law Judge.
>
> The Office of the Inspector General notified the Social Security Administration (SSA), as required by law, that there was reason to believe fraud was involved in certain cases including evidence from Bradley Adkins, Ph.D., Sriinivas Ammisetty, M.D., Frederick Huffnagle, M.D., or David Herr, D.O.
>
> Under the Social Security Act, SSA must redetermine an individual's disability case when there is reason to believe fraud or similar fault was involved in that individual's application for benefits. The law requires SSA to disregard any evidence from one of the medical providers identified above when the information was submitted by representative Eric C. Conn or other representatives associated with Mr. Conn's law office.
>
> One or more of these sources provided evidence in your case, and we used that evidence to find you disabled.  Therefore, we are suspending your benefits while we redetermine whether you were entitled to benefits.
>
> We will let you know when this decision has been made.

reason to believe that fraud had affected the application of the individual being suspended, other than the identity of the physicians involved, and demonstrated no indication that any individual file had been examined to see if it appeared to actually have been affected by fraud. Each member of the Plaintiff class was thus left to wonder what he or she was actually accused of or why fraud was suspected in his her or individual case. No member of the Plaintiff class was given opportunity to challenge the determination that there was reason to believe that fraud had been involved in his or her case or that it should be re-opened and re-determined.

Many members of the Plaintiff class, possibly the majority, have been re-evaluated and recertified since their initial disability determinations, before the May, 2015, "Conn" notices were issued. (*See* the **6-26-15 Affidavit of Robert Q. Martin**, attached hereto as **Exhibit "A"** to this Memorandum). This means that routinely, the SSA has looked at their cases again, sometimes asking for additional information or new medical evidence, and has found that they continued to be disabled.

The notifications informed beneficiaries that all medical evidence from the named physicians had been "thrown out," so to speak, and that without it, their disabilities, ranging from cancer to amputations among members of the class, were no longer proven. What the SSA wanted them to do, then, was to submit additional medical evidence supporting the legal proposition that each was disabled on the date when the original disability determination was made – many of them several years ago, like the one in the footnoted example above. The SSA offered only ten (10) days within which to submit this evidence.

Many went to other medical providers they had seen, and of course, were told that within the provisions of law, it would take up to 30 days to provide copies of medical records. They were told that they would be charged up to $1/page, because their former attorney, Eric C. Conn,

3

had already accessed their "one free copy" provided under law, using forms on which he had obtained their signatures. Unfortunately, since the SSA's action came toward the end of May (and curiously, it took ten days for most class members to receive these notices by regular mail), and since benefits were terminated immediately, meaning that SSD recipients would receive no June payment, the vast majority whose only income is their SSD benefit were unable to hope to pay such a cost. Even if they had received benefits, most are living in poverty, and would have been unable to divert their rent or utility payments to purchase copies of their medical records. With a deadline they could not meet, and a cost they could not possibly bear, many members of the class despaired. Two members of the class, believing their benefits to be hopelessly lost, committed suicide. Others have continued to threaten to do the same, and those familiar with the general mood among the members of the Plaintiff class are taking those threats seriously. (*See* the **6-26-15 Affidavit of Robert Q. Martin**, attached hereto as **Exhibit "A"** to this Memorandum).

Attorney Eric C. Conn has steadfastly refused to assist his former clients by providing copies of their legal files. In fact, it has been strongly alleged in a variety of contexts that following the institution of a Congressional investigation into his fraudulent activities, Conn engaged in a mass destruction of files, electronic records, computer hard drives, emails, financial records, smuggling and illegal campaign donations, including his client files. See Affidavits of Melinda Martin and Jamie Slone previously filed in this action R.4.

When the May, 2015, "Conn" notices were received, those who practice poverty law in eastern Kentucky immediately began a massive effort to assist these people. An emergency meeting of the Floyd County Bar Association resulted in a consensus that the numbers were staggering, but all present plowed into the problem. Public meetings were held, and both private

4

attorneys and legal aid attorneys assisted class members in filling out applications for an extension of time within which to submit evidence.  Others began efforts to persuade medical providers that under the exceptional circumstances of this case, one more free copy of records should be provided, to which many have agreed, while others have not.

To date, even with unprecedented efforts to solicit legal assistance for members of the class who face hearings, there has been inadequate time to obtain medical records and inadequate numbers of pro bono attorneys to represent those in this impoverished class who must "re-prove" that they were disabled years ago, much less to coordinate and assign existing attorneys to members of the class.  The **Affidavit of Robert C. Johns**, Executive Director of AppalReD Legal Aid in Prestonsburg, submitted herewith as **Exhibit "B"** to this Memorandum, details what has been accomplished in the one month since this situation first arose:

1. My name is Robert C. Johns.  I am the Executive Director of the Appalachian Research and Defense Fund of KY, INC., 120 North Front Avenue, Prestonsburg, Kentucky 41653, a non-profit organization commonly known as "AppalReD," which provides legal aid services in thirty-seven counties of eastern and south-central Kentucky.
2. In addition to federally-funded legal aid services from AppalReD staff attorneys, AppalReD also administers a volunteer lawyers program, Volunteer Lawyers for Appalachian Kentucky ("VLAK").
3. AppalReD normally provides services to low-income or elderly individuals facing disability hearings or disability benefit termination hearings.
4. AppalReD and VLAK are acting as a coordinating unit for attorneys who have volunteered to provide assistance to those facing hearings as the result of a situation in which 1,500 people who are former clients of disability attorney, Eric C. Conn, received notices from the Social Security Administration in May, 2015, stating that their disability benefits were being terminated or their initial disability determinations were being set aside.
5. At this time, we are facing a representational crisis of enormous proportions in attempting to scramble together all available resources to provide legal counsel to the group of disability recipients described above.  As of June 25, 2015, AppalReD's records show that 386 disability benefit recipients have sought our services in

5

      response to the May, 2015, "Conn" notices sent out by SSA. This number greatly exceeds our capacity to provide representation or even informal legal advice. More call every day.

6. Efforts to solicit volunteer attorneys have continued across the Commonwealth, including announcements and sign-up booths at the recent Kentucky Bar Association Annual Convention and tireless efforts by several individuals to pull in every available resource. A notice on the front page of the KY Bar Association website pleads for volunteer attorneys to help meet this crisis. The National Organization of Social Security Claimants Representatives (NOSSCR) is actively trying to recruit additional attorneys to provide services to the affected individuals.

7. Recruiting adequate numbers of attorneys to provide legal services at little or no cost to this group of disability recipients requires time. To date, seventy-six (76) attorneys have volunteered to help. This is simply not yet enough people to cover all of those who need help and cannot afford attorneys. Many of these lawyers are not disability attorneys, and we expect that a certain number will be unable to provide the kind of services needed, without additional training that will take time to arrange.

8. Much of the shortage in representation is the result of the size of the class that has been notified and the geographical concentration of the residents in a small area of eastern Kentucky. There are simply not enough attorneys, immediately available, to go around.

9. To our understanding, many claimants have been given only 30 days to produce medical records supporting their claims, and hearings may commence shortly after this deadline expires. This is not adequate time for even our trained staff attorneys to provide competent representation to those who are facing hearings. It certainly is not enough time to recruit and coordinate adequate volunteer attorney efforts.

10. With a reasonable amount of time to recruit and prepare attorneys, we are confident that we could provide coverage for most of those in this situation who are applying for services.

Following receipt of the May, 2015, "Conn" notices, private attorneys also swung into action, filing various lawsuits, one of which is the instant suit. Initially, Plaintiffs filed a complaint and a first motion for a preliminary injunction, asking the Court to prevent Defendant from terminating benefits to the SSD recipients, without a due process prior hearing on that issue. Thereafter, under intense pressure from the public and following pleas from U.S.

Representative Hal Rogers, who described the actions at the SSA as herein "Un-American," Defendant reversed its decision on that matter and announced that it would provide hearings to all, prior to any terminations.

Unfortunately, that decision solved only the publicity problems SSA had created for itself with its abrupt policy decision to harass and punish those who had selected premier local disability attorney Eric C. Conn during the time when his favored "expert" physicians were those named in the May, 2015, "Conn" notices from SSA. Publicly, then, the SSA could claim to have done what it was supposed to do.

However, the unconstitutional, illegal treatment by SSA of members of the Plaintiff class was just beginning. All indications now are that Defendant intends to plow forward with deadlines and hearings as quickly as possible, with just as little disregard for whether such procedures comport with constitutional safeguards. During a phone conference between the undersigned counsel, John Rosenberg[2] and counsel for the SSA, the SSA steadfastly refused to advise when the proposed 1,500 hearings would commence.

For example, in response to the many requests for extension prepared with the untiring assistance of volunteer attorneys, SSA extended the deadline for submitting medical records from ten days to thirty days (See filing of Defendant R. 8), knowing that this grossly inadequate extension of twenty days (from five days after the date of the notices, per SSA regulation) makes

---

[2] It is ironic that the SSA lawyers who participated in the phone conference were likely in the same building that former Justice Department Attorney John Rosenberg occupied 50 years at the time. The significance is that John Rosenberg has received numerous awards for his work in the civil rights division attempting to protect the rights of the innocent, vulnerable people in Selma, Alabama and Meridian, Mississippi. It is the view of the Plaintiffs, that the lawyers in the Justice Department are now violating the rights of vulnerable and innocent people.

no practical difference for the vast majority of the Plaintiff class, who cannot hope to obtain them or have them reviewed by competent attorneys within that time.

Many members of the class suffer from debilitating mental disabilities, as most obviously and regrettably demonstrated by the suicides and continuing threats of suicide.  In point of fact, many of the Plaintiff class cannot read and write.  These people rely on others for assistance with even simple daily affairs.  They are unable to complete basic information sheets or even do legal aid telephone screenings alone, as they cannot spell street names, etc., for screeners.  Just as these disabled people relied on Eric C. Conn to guide them through the initial disability process, they must now rely on trained attorneys to guide them through the legal mess created by the SSA's decision that they must now re-prove that they were "legally disabled" – a legal definition that embodies complex knowledge of SS regulations, rules, and even job markets -- at a discrete point in time, years ago.

Plaintiffs submit that the disabled people who comprise the Plaintiff class should be able to rely on their government for fair treatment that is reasonable and cognizant of the difficulties they face – many of those difficulties created by the government's own behavior in this matter. It has become apparent that Defendant does not agree.  Perhaps this Court will.

Plaintiffs' renewed motion for preliminary injunction now asks the Court for an order prohibiting the Defendant from holding any hearing until it can certify to the Court that procedural due process and Constitutional safeguards have been comported with and are in place to protect the present and future rights of the Plaintiffs and Class Members.  Plaintiffs have good reason to seek this Court's protection.  In addition to granting a wholly inadequate "extension" of time within which to obtain and submit medical records to support class members' original determinations of legal disability, the SSA has given every indication that it intends to proceed,

as quickly as possible, to conduct hearings on that legal question, whether or not class members have had any further notice of what the SSA claims is wrong with their individual "initial determinations," and whether or not class members have had a reasonable period of time within which to obtain legal representation in the midst of a "representational crisis" that was created by SSA's own actions in initiating this massive redetermination move within such a small geographical area.

Plaintiffs have filed an amended complaint, continuing to allege that Defendant's actions fail to provide due process and equal protection to the Plaintiffs and are contrary to the provisions of their own statutes and regulations; that the actions of Defendant violate the rights of Plaintiffs as disabled persons under the Americans with Disabilities Act (ADA); and that Defendant's en masse move constitutes a de facto policy of the agency that fails to comport with any of the above. Plaintiffs have asked for a declaratory judgment that Defendant's actions violate constitutional and statutory law.

Most importantly as an emergency matter, Plaintiffs pray for a preliminary injunction preventing the SSA from going forward until it has addressed the issues of providing due process and Constitutional safeguards to ensure that these Plaintiffs and all Class members are treated fairly by the government, in what all agree is an extraordinary situation.

## **LEGAL ARGUMENT:  THE STANDARD FOR GRANTING A PRELIMINARY INJUNCTION**

Federal Civil Rule 65 provides for the issuance of preliminary injunctions upon notice to the opposing party. When determining whether to grant the requested preliminary injunction, the Court should consider four factors:

> (1) the plaintiffs' likelihood of success on the merits, (2) whether the plaintiffs could suffer irreparable harm without the injunction, (3) whether granting the injunction will cause substantial harm to others, and (4) the impact of the injunction on the public interest.
>
> *County Security Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 484 (6th Cir. 2002) (quoting *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)).

These four factors must be balanced – no one factor, standing alone, is necessary in order for the preliminary injunction to be granted. Golden, 73 F.3d at 653; Mascio v. Public Employees Retirement Sys. of Ohio, 160 F.3d 310 (6th Cir. 1998)(Stating that these considerations are "factors to be balanced, not prerequisites that must be met.").

It is important to note that the Plaintiffs' request for a preliminary injunction is not intended to obtain a final remedy for the claims set forth in the Amended Complaint, but rather is to forestall irreparable and potentially catastrophic injury to the Plaintiffs until the merits are ultimately decided. In other words, the Plaintiffs seek herein "to preserve the relative positions of the parties until a trial on the merits can be held[,]" which is precisely the purpose of a Rule 65 preliminary injunction. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). *See also* Carey v. Wolnitzek, 2006 U.S. Dist. LEXIS 70281, *3 (E. D. Ky. 2006) (citing Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir.), *cert. den.*, 126 S.Ct. 361 (2005)) ("The substantive issue on a motion for preliminary injunction is whether the movant has established a *likelihood* of success on the merits").

While all of these considerations are often difficult determinations in early stages of litigation, it can be particularly difficult to show a "strong or substantial likelihood of success on the merits," where the case involves complex or novel questions of law or presents a matter of first impression. Nevertheless, the balance of the four relevant considerations can still make issuance of an injunction appropriate, when the moving party can "at least show[] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir. 1982).

As demonstrated herein, when all four factors are considered, the Plaintiffs are clearly entitled to the requested injunctive relief.

**A. There Is A Strong Likelihood That The Plaintiffs Will Prevail On The Merits.**

There can be no question but that the Defendant's rash actions herein, in pursuing a slipshod policy of summarily reviewing, attempting to suspend benefits, and continuing to pursue a course of harassment against the members of the class, all based on no more than the identities of the physicians who provided medical evidence in support of their disability claims, have violated the due process and equal protection rights of these Plaintiffs. The Defendant's half-baked policy decision has resulted in mistakes that in some cases are visible to the naked eye, such as proceedings against amputees whose disability benefits are now threatened; and some that were not, such as proceedings against the cancer patients who represent the class or against those who were mentally disabled and took their own lives upon hearing of Defendant's action. These dire and disastrous mistakes have been made for no other reason than that Defendant's policy is unfair, unreasonable, and arbitrary. When the merits of the moving party's

11

claims are particularly strong, as is the case here, a preliminary injunction is appropriate. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (for purposes of a preliminary injunction request, the question most often turns on the strength of the merits of the movant's claim).

The demonstration of past wrongs by Defendant and Defendants stated intent to proceed forthwith against all members of the class, without further attempts to determine whether fraud affected the applications of those individuals, adds additional support to the Plaintiffs' request for a preliminary injunction in order to avoid continuing future acts by Defendant contrary to law. The purpose of the preliminary injunction is to prevent future violations. United States v. W. T. Grant Co., 345 U.S. 629 (1953). *See also* United States v. White County Bridge Com., 275 F.2d 529 (7th Cir. 1960), *cert. den.* 364 U.S. 818 (1960) (the equitable remedy of injunction is intended to be preventive, prohibitory, protective or restorative).

Many members of the Plaintiff class, possibly the majority, have been re-evaluated and recertified since their initial disability determinations, before the May, 2015, "Conn" notices were issued. (*See* the **6-26-15 Affidavit of Robert Q. Martin**, attached hereto as **Exhibit "A"** to this Memorandum). This means that routinely, the SSA has looked at their cases again, sometimes asking for additional information or new medical evidence, and has found that they continued to be disabled. In light of these re-evaluations, the Defendant's actions seem particularly arbitrary, and the likelihood that Defendant examined individual files before implementing its rash policy seems even more slight.

Defendant's reckless treatment of benefit recipients in this matter is unconscionable, unforgivable, and certainly not what people expect from a government program designed to protect them. The essence of due process is fairness – notice of the claim being made and a reasonable opportunity to be heard. Here, there is no indication that the Defendant investigated

any of the Plaintiffs' individual files, but if it did, it has provided no indication of what it found. Defendant did not notify the Plaintiffs that their benefits were being investigated; nor did the Defendant provide the Plaintiffs with any opportunity to provide evidence prior to the determination that the results of their initial disability hearings would be "thrown out."

In addition to the constitutional concerns raised by this course of conduct, the Defendant's actions violate the Social Security Act and related regulations. For example, 20 C.F.R. § 404.992 states in pertinent part as follows:

> ***If an administrative law judge or the Appeals Council proposes to revise a decision***, and the revision would be ***based on evidence not included in the record on which the prior decision was based***, you and any other parties to the decision will be *notified, in writing, of the proposed action and of your right to request that a hearing be held **before any further action is taken.*** *See* 20 C.F.R. § 404.992 (emphasis added).

The Defendant's actions in the present case are allegedly based on an internal review and information obtained by the Defendant regarding investigations of attorney Eric C. Conn's actions, which were previously unknown to members of the Plaintiff class. Such reports constitute evidence that was not included in the record on which the initial disability determinations were made.[3]

The SSA's actions herein constitute a de facto policy that violates its own statute and fails to comport with Constitutional rights guaranteed to individuals. Pursuant to 42 U.S.C. 405(u), the Social Security Commissioner shall only redetermine a case "if there is a ***reason*** to ***believe*** that fraud or other fault was involved in the application ***of the individual***." This language comports with the general understanding of due process and equal protection under the

---

[3] The stated basis for the action is an investigation of the Office of the Inspector General's report. The Plaintiffs have requested this report. It has not been provided.

13

U.S. Constitution; however, the de facto policy by which the SSA has chosen to implement the statute in this matter does not.

Defendant's own notices, as shown in footnote 1 above, stated the totality of the grounds that Defendant has thus far provided for its expansive, unfair actions:

> The Office of the Inspector General notified the Social Security Administration (SSA), as required by law, that there was reason to believe fraud was involved *in certain cases* including evidence from Bradley Adkins, Ph.D., Sriinivas Ammisetty, M.D., Frederick Huffnagle, M.D., or David Herr, D.O.

While Congressional reports and referrals from the Inspector General might provide the Defendant with suspicion that would merit further investigation into the merits of individual disability determinations that were supported by evidence from doctors suspected of fraud in other cases, the Defendant's actions indicate that it has not undertaken investigation of any individual files belonging to members of the Plaintiff class, in order to make the determination that there is "reason to *believe*" that fraud was involved in each of these applications; or for that matter, whether there is reason to believe that the suspected fraud related to the nature and extent of the claimant's disability or whether such fraud related only to the manner and presentation of the disability claim (i.e., fraud that helped Eric C. Conn push cases through faster and thus, make more money for his group of conspirators).

Such notice, that someone else probably committed some fraud, of some indeterminate nature and effect, in someone else's case, informs these Plaintiffs of nothing relating to their own disability claims or why they, as individuals, are being reviewed. Such notice fails to fairly apprise Plaintiffs of the claim to which they are to respond.

Defendant has now begun attempting to push members of the class who requested reasonable extensions of time into providing evidence within thirty (30) days. The Defendant

knows well that Plaintiffs' former attorney, Eric C. Conn, engaged in a massive destruction of their records and that his office is refusing to provide copies of records to those who request them; that it is difficult to obtain even recent medical records from medical providers in less than thirty days; that these recipients must endeavor to obtain medical records that are by no means recent, if they are still preserved at all by medical providers; that a thirty-day limit leaves no time for reviewing those records with counsel; that a substantial number of these people cannot afford to pay legal retainers; that the size of the class is so large that the usual volunteer/legal aid community is grossly inadequate to absorb it; and that a coordinated effort is underway by several organizations to obtain representation for members of the class.

      The vagueness of the notices described above also affects the issue whether Plaintiffs have been afforded a reasonable time to respond to the Defendant's actions. Certainly, ten days was not reasonable. Thirty days is not much more so. Hearings next month, if that is how Defendant plans to proceed (since no one knows but Defendant), would be devastating to the basic rights and lives of the Plaintiff class members.

      Because of the extraordinary nature of this situation – a proposed, *en masse* deprivation of Constitutional rights that would likely result in the erroneous loss of livelihood for possibly hundreds of people at the hands of a government agency implementing a rash policy decision – this Court should have no difficulty finding that the Plaintiffs are likely to prevail on their claims of violation of the Constitution and statutes of the United States.

      If, however, the Court finds that the case presents novel or complex questions of law, it should still act to enjoin Defendant's conduct, based on the Plaintiffs' clearly having shown "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." Friendship Materials, Inc., *supra*, 679

F.2d 100, 105 (6th Cir. 1982), and on the heavy balance of the remaining three considerations involved in a preliminary injunction determination.

B. **The Plaintiffs Will Suffer Irreparable Harm Unless An Injunction Is Issued**

No harm is more irreparable or less fully compensable by money damages than death, and since the initiation of this action, at least two members of the class have suffered death as the result of Defendant's actions.[4]  This result was entirely foreseeable, as many members of the class suffer from grave mental or emotional disabilities that include symptoms like suicidal ideations or suicidal tendencies; the very reason some of these people are unable to work is that their interaction with the normal unfairness of the public workplace is too stressful to be born.  In spite of these horrifying results, Defendant clearly intends to continue to careen down this path of destruction.

For most, this action by Defendant continues to create a hopeless situation.  For many, hopeless situations are dangerous.  With every push forward Defendant makes toward placing these people in eventual homelessness, destitution, and inescapable debt owed to their government, by the absolute least fair means that Defendant believes it can arguably get away with before this Court and the public, more threats of suicide are heard.  There is only so much that attorneys and helpless relatives can do to encourage these people to seek additional help from doctors and governmental organizations, after their betrayal by their attorney, the doctors they trusted, and now, by the Defendant -- an organization created to protect the well-being and

---

[4] The undersigned counsel has been in recent contact with at least 5 other class members who are actively suicidal. On June 22, 2015 the undersigned counsel called 911 to request a welfare check on one gentleman in Pike County who posted a suicide note online. He was convinced he would not get a fair hearing before the SSA, and wanted to add to the SSA body count.

16

rights of these people and to elevate them to a level of societal normalcy they would not likely otherwise occupy.

Defendant's enormous resources give it the clear advantage, here, in pursuing its goal to deprive the Plaintiffs of their disability benefits in an unreasonably short period of time. As shown by the affidavit of the hard-working Robert C. Johns, Executive Director of AppalReD Legal Aid in Prestonsburg, Kentucky, the month that has elapsed between the time when this situation arose has been grossly inadequate to allow Plaintiffs to prepare properly for the government's action against them. Plaintiffs have had inadequate time, under the requirements imposed by Defendant, to obtain the evidence summarily demanded by the government or to obtain even basic legal advice about what is happening to them.

The result is that if the Defendant pursues its intention to conduct hearings as quickly as possible, and well before the issues in this case are decided, then members of the Plaintiff class who are forced into "new" disability hearings to determine if they were legally disabled years ago will do so without the needed records; without legal assistance that initial claimants are entitled to; and without notice as to what is wrong with their original files. Under those circumstances, they are very likely to lose their hearings on bases that do not relate to the merits of their claims; to lose the benefits that provide basic sustenance; and to incur sudden, huge, inescapable debt to their government for alleged "overpayments" of benefits that would total tens of millions of dollars among the class. They would suffer hunger, homelessness, and some would suffer death.

The potential harm to Plaintiffs will be irreparable and the Plaintiffs respectfully submit that the requested preliminary injunction is the only way to protect them from ongoing damage while this matter proceeds to trial. This Court must act to ensure that Defendant provides

Plaintiffs with a fair opportunity to gather their evidence and respond, with assistance of counsel, to the vague accusations of fraud made by Defendant. Since Defendant has chosen, by its own policy, to treat these people differently from others being reviewed by SSA to determine whether their initial applications were validly upheld, by requiring them to respond to this catastrophe in less time with fewer resources, and all evidence indicates that Defendant will push this course to its very limits, the Court should provide those limits within a structure built on constitutional due process and equal protection rights.

C. **A Preliminary Injunction Will Not Cause Substantial Harm To Defendant**

The third element in the preliminary injunction analysis – the likelihood of substantial harm to others – weighs entirely in favor of the Plaintiffs.  It cannot possibly be less of an administrative burden to set up a special, faster hearing schedule for members of the Plaintiff class and push this mass of hundreds of cases to full hearings at the forefront of the normal process.  Such a move must be costing the Defendant something additional, above and beyond the expense that would be incurred in providing fair notice of its claims and a fair opportunity for responses that would likely cull out a huge number of people from the need to conduct new hearings.

The reality is that the additional expense Defendant is creating for itself is an investment; Defendant knows very well that if it pursues the course of conducting fast hearings on issues that are years old, it will win a great number of them.  The payoff will be the money that rightfully should have been paid to disabled individuals thereafter, along with whatever it can collect of the overpayments it plans to assess.

D. **The Public Interest Favors Issuance of the Preliminary Injunction.**

Finally, the Court should have little difficulty concluding that the public interest is best served by enjoining the Defendant from proceeding in an unconstitutional manner and requiring it to provide proof of its plans in order to allow this Court to make that determination. In light of the harm already caused to members of the Plaintiff class and the threat of additional, irreversible harm, it is obvious why preservation of the status quo and preventing recurring violations are important public policy considerations and are likewise important factors in considering whether to grant a preliminary injunction; here, they weigh heavily in favor of the injunction requested by this disadvantaged class of Plaintiffs. *See* United States v. W. T. Grant Co., supra; United Mine Workers v. Int'l Union, United Mine Workers, 412 F.2d 165 (D. C. 1969).

## II.     CONCLUSION

The Plaintiffs seek a narrowly-tailored preliminary injunction in order to prevent the violation of the fundamental Constitutional rights of all class members brought before the Social Security Administration ("SSA") in response to the May, 2015, notices.

The Plaintiffs simply ask that the Defendant offer up a planned course of action that comports with due process, fair notice and a fair opportunity to be heard on the issues. The SSA should not be able to proceed until such time as they can certify to this Court that proper procedural and constitutional safeguard is in place.

The Plaintiffs have demonstrated that the requested preliminary injunction is warranted under each of the four factors utilized in determining if a preliminary injunction is appropriate.

The facts in this case are astonishing. It is doubtful any such facts have ever arisen before in a Court of Justice. Given the extraordinary nature of the facts presented; an "extraordinary remedy" is reserved for "extraordinary causes." Ex parte Fahey 332 US 258 (1947).

19

This is such an extraordinary cause.

Respectfully submitted,

*/s/ Hon. Ned Pillersdorf*
Hon. Ned Pillersdorf
Pillersn@bellsouth.net
PILLERSDORF, DEROSSETT & LANE

Dated: June 26, 2015

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Second Motion of Realtors for Preliminary Injunction and the Memorandum in Support of the Second Motion, including exhibits attached thereto and a proposed Order was served on the 26th day of June, 2015 electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures and Standing Order upon all parties in the electronic filing system in this case and by U.S. Mail to:

David B. Daugherty
1127 13th Street
Apt. 204
Huntington, WV 25701

/s/ *Ned Pillersdorf*
NED PILLERSDORF
Co-Counsel for Plaintiffs

20