UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| CHERYL MARTIN and ROBERT MARTIN, *individually, and on behalf of all others similarly situated*, | ) ) ) ) | Civil No. 15-46-ART |
| Plaintiffs, | ) ) | |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, *Acting Commissioner of Social Security*, | ) ) ) ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The question presented here is whether the Court may intervene in the affairs of the Social Security Administration ("SSA") before the SSA has completed its own review. The answer is no. This case must therefore be dismissed.

### BACKGROUND

Each of the plaintiffs sought disability benefits from the SSA. *See, e.g.*, R. 1 at 6. To get benefits, they hired counsel—Eric C. Conn—to assist them with the process. *Id.* Conn was successful, and the plaintiffs obtained benefits. *Id.* In 2015, however, the SSA found reason to believe that the plaintiffs' applications for benefits included fraudulent medical evidence. R. 26 at 8. Once the SSA suspects fraud, it must review the file without the fraudulent evidence to determine if the claimant is entitled to benefits. 42 U.S.C. § 405(u)(1)(A). The SSA initially cut off the plaintiffs' benefits while it redetermined the plaintiffs' eligibility. R. 15 at 2; *see* R. 1-2; R. 1-5 (suspension letters). After public outcry,

reason ultimately prevailed.  *See Press Release*, Congressman Hal Rogers, http://halrogers. house.gov/news/documentsingle.aspx?DocumentID=398318 (June 4, 2015).  The SSA reinstated the plaintiffs' benefits and created a new process to determine whether the plaintiffs were actually entitled to benefits.  R. 15-1; R. 8 at 2.

The SSA's new process had multiple steps.  The claimant had up to 40 days to submit new evidence of her disability to the Appeals Council.  R. 8-1 ¶ 5; R. 15-1 ¶ 8.  The Appeals Council would review the new evidence and make a determination.  *Id.* ¶ 9.  If the Appeals Council found her eligible for benefits, her benefits would continue and the process would be complete.  But if the Appeals Council found her ineligible for benefits, her case would be remanded to an ALJ for a hearing.  *Id.* ¶ 9.  The claimant could submit more evidence of her disability to the SSA up until her ALJ hearing.  *Id.* ¶ 11.  If the ALJ determined she was disabled, her benefits would continue.  Otherwise, her benefits would stop and she could appeal the ALJ's decision through the normal SSA appeals process.  R. 8-1 ¶ 7; *see also* R. 25-1 at 8.

The plaintiffs argue that "procedural due process" and "Constitutional safeguards" require the SSA to do certain things during the redetermination process and not to do others. R. 12 (motion for preliminary injunction); R. 12-4 at 8; *see* R. 18-1 at 18–19.  For example, the plaintiffs argue that they should be able to challenge the SSA's initial decision to open their cases for redetermination before or during the redetermination process.  R. 12-4 at 19; *see* R. 21 at 5–6.  The defendants moved to dismiss the plaintiffs' claims for, among other things, lack of jurisdiction.  R. 25.  Because the plaintiffs failed to exhaust their claims with the administrative agency, the Court lacks jurisdiction.  Thus, the case must be dismissed.

## DISCUSSION

The Social Security Act allows judicial review only in limited circumstances. Courts have jurisdiction to review only the "final decision of the Commissioner . . . made after a hearing to which [the individual] was a party." 42 U.S.C. § 405(g); *see also id.* § 1383(c)(3). Thus, the plaintiffs must first bring all legal attacks through the agency's administrative process. *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 12–13 (2000). This requirement prevents courts from interfering prematurely in agency decisions. *Id.* Although delay in obtaining judicial review during the benefits process occasionally harms individuals, it is a necessary cost of "massive, complex" health and safety programs like Social Security. *See id.* at 13 (referring to Medicare).

So how does someone get judicial review? First, that person must "present" her claim to the Commissioner. *Cathedral Rock of North College Hill, Inc. v. Shalala*, 223 F.3d 354, 359 (6th Cir. 2000). In other words, the Social Security Administration must have a chance to look at the claim before a court does. Second, the claimant must complete all the steps in the SSA's internal administrative review process, also known as the "exhaustion" requirement.[1] *Id.*

**I.      The Plaintiffs Have Not Exhausted Their Administrative Remedies.**

The plaintiffs argue that the SSA's decision to reopen their cases after the Office of Inspector General discovered potential fraud is a "final decision" under § 405(g), which would allow for judicial review. R. 28 at 3–6. But they are incorrect. A final decision under § 405(g) is a decision about whether a claimant is entitled to benefits. *Mathews v. Eldridge*,

---

[1] Although the Commissioner may not waive presentment, she may waive exhaustion when "she deems [it] futile." *Heckler v. Ringer*, 466 U.S. 602, 617 (1984). The Commissioner has not waived the exhaustion requirement here.

424 U.S. 319, 329 (1976). Furthermore, a claimant must complete all three stages of the SSA's administrative appeals process to receive a "final decision" under § 405(g). *Bowen v. City of New York*, 476 U.S. 467, 482 (1986).

Here, the SSA's decision to open some beneficiaries' files for redetermination is not a final decision for benefits under § 405(g). Deciding to redetermine eligibility based on the *suspicion* of fraud is not the same as denying an individual benefits because his claim is fraudulent. The SSA has not yet deemed the plaintiffs ineligible for benefits. The plaintiffs' benefits will continue at least until their ALJ hearings. If either the Appeals Council or the ALJ determines a plaintiff is eligible for disability benefits, his benefits will continue. If the ALJ denies the plaintiff benefits, he can appeal that decision through the normal SSA administrative appeals process. Then, after the normal SSA appeals process is complete, the plaintiff can obtain judicial review of the final decision to deny him benefits under § 405(g). R. 30 at 4, 7. The plaintiffs have not received final decisions on their benefit claims. Therefore, they have yet to "exhaust" their claims.

## II.        No Waiver of the Exhaustion Requirement Applies Here.

The plaintiffs argue that the Court should waive the exhaustion requirement here. Courts may waive the exhaustion requirement when a plaintiff's claim is (a) "entirely collateral" to—*i.e.*, separate from—his substantive claim for benefits and (b) he raises a "colorable claim" that erroneous termination would damage him in a way retroactive payments could not correct. *Bowen*, 476 U.S. at 483; *see Ill. Council on Long Term Care, Inc.*, 529 U.S. at 15; *Cathedral Rock*, 223 F.3d at 359; *see also Oakland Med. Grp., P.C. v. Sec. of Health and Human Servs.*, 298 F.3d 507, 510 (6th Cir. 2002). "Application of the exhaustion doctrine is intensely practical" and not merely "mechanical." *Bowen*, 476 U.S.

at 484 (internal quotation marks omitted). Courts should consider the policy reasons for exhaustion, such as the creation of an administrative record or deference to agency expertise. *Id.* at 484–85.

The plaintiffs argue that their challenge to the SSA's decision to reopen their cases is "entirely collateral" to their claims for benefits. R. 21 at 5–6. A claim is not entirely collateral when a plaintiff's success on that claim would mean entitlement to benefits or increased benefits. *See Cathedral Rock*, 223 F.3d at 363. Here, the plaintiffs' challenge to the SSA's decision to reopen their cases is not "entirely collateral" to their substantive claims for benefits. If the Court held that the SSA wrongfully opened the plaintiffs' files for redetermination, the plaintiffs' disability benefits would continue without the possibility of termination. *Compare Cathedral Rock*, 223 F.3d at 363 (claim was not "entirely collateral" where favorable resolution of claim would result in reinstatement of Medicare provider agreement), *with Mathews*, 424 U.S. at 329 (claim was "entirely collateral" where claimant's entitlement to pre-deprivation hearing would not change claimant's entitlement to benefits). Moreover, an entirely collateral claim involves issues "completely separate" from whether the claimant is entitled to benefits. *Cathedral Rock*, 223 F.3d at 363. The Court's review of the SSA's decision to reopen the plaintiffs' cases would not involve "completely separate issues" from the Court's review of the plaintiffs' entitlement to benefits. The SSA reopened the plaintiffs' cases because the agency suspected that four specific doctors—upon whom the plaintiffs' applications relied—provided fraudulent medical evidence. *See* R. 1-3; R. 1-6. In order to determine whether the four doctors provided false evidence of disability, the Court may have to examine whether the plaintiffs are actually disabled. And how would the plaintiffs prove that a doctor was telling the truth when she said they were disabled? Perhaps

5

by providing corroborating evidence from other doctors. The plaintiffs are currently submitting that very evidence to the SSA to prove that they are entitled to benefits. So the issues in both claims are not completely separate. Therefore, the plaintiffs' claims fail to meet the "entirely collateral" test.

The plaintiffs then argue that this case is similar to *Bowen v. City of N.Y.*, 476 U.S. 467 (1986), where the Court waived exhaustion. R. 28 at 6–7. In *Bowen*, the SSA used a secret policy to deny some claimants benefits to which they were legally entitled under the Social Security Act and its regulations. *Bowen*, 476 U.S. at 474–75. The plaintiffs—who had been denied benefits—brought a class action suit challenging the "clandestine" policy in federal district court. *Id.* at 473–75. Some of those plaintiffs had not finished the SSA's internal appeals process. *Id.* at 475–76. They argued that requiring all plaintiffs to exhaust their administrative remedies would put them through great trauma without the ability to challenge the secret policy at any stage of the SSA appeals process. *Id.* at 483–84. The *Bowen* Court allowed the plaintiffs' suit to proceed without exhaustion. *Id.* at 486 (holding district court did not err in holding that (a) the plaintiffs' claims were collateral and (b) the plaintiffs raised "at least a colorable claim" that retroactive payments would not fully compensate them).

Here, the plaintiffs argue that the SSA used some unknown process to determine that fraud might have been involved in their applications and that they cannot challenge that determination. In their view, they will instead have to submit new evidence of disability. And if they are denied benefits, they say, they will have to endure the trauma of the SSA appeals process without benefits before the Court will determine whether the initial process was valid. In sum, the plaintiffs argue that, like the plaintiffs in *Bowen*, some of them will go

6

through the SSA's process and lose their benefits without ever being able to challenge the agency's initial determination that fraud might have been involved.

During the appeals process, however, the plaintiffs *can* challenge the SSA's determination that fraud might have been involved in their applications for benefits, unlike the plaintiffs in *Bowen*. Because the *Bowen* plaintiffs did not know about the SSA's clandestine policy,[2] they would not know to collect information to rebut the policy during their hearings or appeals. *See Bowen*, 476 U.S. at 482. Here, however, the plaintiffs know exactly what the SSA is doing and can challenge the suspicion of fraud during the appeals process. The SSA told the plaintiffs why the agency was redetermining their eligibility: suspected fraud in medical evidence provided by four doctors. R. 1-3; R. 1-6. Then the plaintiffs were able to submit medical evidence that they are disabled, rebutting any suspicion that their application was fraudulent. Indeed, the SSA *asked* the plaintiffs to submit new medical evidence in support of their disabilities before and during their ALJ hearings. *See* R. 8-1 ¶ 5; R. 15-1 ¶¶ 5, 9, 11. The plaintiffs in *Bowen* had no such opportunity.

Moreover, *Bowen* cabins itself to its unique factual circumstances. Courts should not waive exhaustion whenever a claimant alleges "an irregularity in the agency proceedings" or incorrect application of an agency's regulation. *Bowen*, 476 U.S. at 485. Courts should "be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. For the reasons discussed above, *Bowen*'s reasoning does not support waiving exhaustion in this case.

---

[2] No claimant knew about the policy, nor was it published in the Federal Register as required by the Administrative Procedure Act. *Bowen*, 476 U.S. at 473–76.

7

**III.      The Court Does Not Have Federal Question Jurisdiction over This Case.**

The plaintiffs next argue that this Court has jurisdiction because this case raises a federal question. Under the Social Security Act, courts generally do not have federal question jurisdiction over claims "arising under" the Social Security Act. 42 U.S.C. § 405(h); *see Heckler v. Ringer*, 466 U.S. 602, 615 (1984). "Arising under" is construed broadly to include "evidentiary, rule-related, statutory, constitutional, or other legal" challenges to benefit denials. *Ill. Council on Long Term Care, Inc.*, 529 U.S. at 10. The plaintiffs' challenges fall into those categories. For example, they argue that it is unconstitutional for the SSA to reopen their applications for benefits and that the SSA should not exclude the allegedly fraudulent medical evidence when determining their eligibility for benefits. Indeed, all of the plaintiffs' claims "arise under" the Social Security Act because they challenge some aspect of the agency's decision about their benefit claims. *Id.* Therefore, federal question jurisdiction is unavailable.

In response, the plaintiffs argue that an exception to the general prohibition on federal question jurisdiction—called the *Michigan Academy* exception—applies in this case. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986). In *Michigan Academy*, the Court allowed federal question jurisdiction for a challenge to Medicare regulations. *Id.* at 668–69, 680. But *Michigan Academy* is inapplicable to this case. First, the *Michigan Academy* exception applies only when judicial review is otherwise unavailable. *Ill. Council on Long Term Care, Inc.*, 529 U.S. at 19. Without federal question jurisdiction, the *Michigan Academy* plaintiffs would not have been able to obtain *any* judicial review of the agency's decisions. *Id.* The plaintiffs here, however, can obtain judicial review of their benefit decisions once the SSA's administrative process is complete. Dismissing their claims

today merely "channel[s] review through the agency" but does not foreclose it entirely. *Id.* Second, *Michigan Academy* specifically relied on the Medicare statute's legislative history to conclude that Congress did not intend to prevent judicial review of these specific regulations. *See Michigan Academy*, 476 U.S. at 674–78, 680 (declining to comment on the "meaning of [§] 405(h) in the abstract"). The legislative history of the Medicare statute is specific to the Medicare program. And the Medicare program is distinct from the Social Security program. Quite simply, any Congressional intent about judicial review of Medicare reimbursement levels cannot be imputed to judicial review of Social Security disability benefit decisions. Third, *Michigan Academy* found that the Medicare regulations violated the agency's statutory commands. *Id.* at 681 (Congress "expects the courts to grant relief when an executive agency violates [its statutory] command[s]."). Here, the SSA obeyed its statutory commands. As discussed above, the SSA complied with 42 U.S.C. § 405(u)(1) by reopening the cases and disregarding the allegedly fraudulent medical evidence. For these reasons, the Court does not have federal question jurisdiction under *Michigan Academy*.

**IV.     The Court Also Lacks Mandamus Jurisdiction.**

Finally, the plaintiffs argue that the Court has mandamus jurisdiction: the ability to order a United States official "to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. But a court has mandamus jurisdiction "only if [the plaintiff] has exhausted all other avenues of relief . . . ." *Heckler v. Ringer*, 466 U.S. 602, 616 (1984). Here, the plaintiffs may challenge the SSA's decision to redetermine their eligibility in this Court under § 405 once they have exhausted their administrative remedies. *See Wyatt v. Barnhart*, 349 F.3d 983, 983 (7th Cir. 2003) (case where claimant challenged SSA's decision to redetermine his eligibility after a "final decision" by the Commissioner); *see also Heckler*, 466 U.S. at 604–08, 615,

9

617. A litigant who can get judicial review under § 405 has not met the exhaustion requirement for mandamus jurisdiction. *Id.* at 617. Many of the plaintiffs might continue to receive benefits after the SSA's redetermination process. And those whose benefits are terminated may seek judicial review in this Court after a "final decision." The plaintiffs have other avenues of relief available, which means the Court cannot apply mandamus jurisdiction.

## CONCLUSION

The plaintiffs cannot prematurely obtain judicial review of the SSA's decision to reopen their cases. They have not exhausted their administrative remedies and they do not qualify for any exceptions. Nor can the Court address the plaintiffs' claims under federal question or mandamus jurisdiction. Accordingly, it is **ORDERED** that the defendant's motion to dismiss, R. 25, is **GRANTED**. All pending motions are **DENIED AS MOOT**, and this case is stricken from the Court's active docket.

This the 16th day of November, 2015.

Signed By:
*Amul R. Thapar* AT
United States District Judge